UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JANIE ROBLES, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3-11-394 |
| | § | |
| BNSF RAILWAY COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Plaintiff Janie Robles was terminated from her employment as a locomotive engineer at Defendant BNSF Railway Company after committing her fourth "Serious," or "Level S," violation in three years. Her violations run the gamut of employee misconduct, from dishonesty to sexual harassment to safety violations. She now brings suit alleging that her termination was impermissibly motivated by sex discrimination and that the termination constituted retaliation for filing charges of sex discrimination with the EEOC.[1] Robles has no direct evidence of either sex discrimination or retaliation and fails to establish a prima facie case based on circumstantial evidence from which a jury could infer those unlawful motives. Therefore, after review of the evidence in this case, the applicable authorities, and

---

[1] In her response to BNSF's summary judgment motion, Robles, for the first time in this suit, appears to allege that her termination was also or alternatively motivated by race discrimination. *See* Docket Entry No. 22. Robles did not bring a race discrimination claim in either her complaint or her EEOC charge. *See* Docket Entry No. 1-4; EEOC Charge of Discrimination (Mar. 15, 2011), Docket Entry No. 25-1. She may not now raise such a claim in a response to a motion for summary judgment.

1

the arguments of counsel, Defendant BNSF Railway Company's Motion for Complete Summary Judgment (Docket Entry No. 17) is **GRANTED.**

I.  **FACTUAL BACKGROUND**

Robles had a checkered tenure at BNSF. She was originally hired as a conductor trainee in May 2005 and was promoted to locomotive engineer in December 2006. Beginning in September 2008, Robles began committing a string of rule violations that saw her suspended, terminated, reinstated on appeal with her termination reduced to a second suspension, suspended for a third time, and ultimately terminated once more in February 2011.

BNSF requires its employees to follow a number of workplace policies; foremost among these is the General Code of Operating Rules (GCOR), a code of common railroad operating rules that is subscribed to by BNSF and many other railroads in the United States. Among other things, GCOR prescribes employee responsibilities and procedures for moving trains safely. BNSF also requires its employees to follow a number of other internal policies, including the System Special Instructions and the Workplace Harassment Policy.

BNSF evaluates employees who violate its workplace rules under its "progressive discipline" policy, the Policy for Employee Performance and Accountability, commonly referred to as PEPA. Under PEPA, rule violations are categorized as Non-Serious, Serious, or Stand Alone Dismissible. An employee

who commits one Stand Alone Dismissible violation, which, as its label suggests, is the most severe kind of offense, may be terminated based on that violation alone. Employees may also be terminated if they commit two or more Serious violations, also referred to as Level S violations, in a three-year time period. A given violation's categorization is not automatic; rather, its categorization depends on the type of conduct involved in the violating act and the harm or potential harm that conduct caused or could have caused to the public, BNSF personnel, or property.

An employee accused of committing a Level S or Stand Alone Dismissible rule violation has the right to a formal investigation hearing in front of a Conducting Officer under BNSF's labor agreement with its union, the Brotherhood of Locomotive Engineers and Trainmen. BNSF employees also have the option to waive their right to a hearing, decline to contest the alleged violation, and accept the proposed punishment. If an employee invokes his or her right to a hearing, the Conducting Officer considers all evidence, determines whether a violation occurred, and recommends the appropriate disciplinary action to be taken. The employee, who may be represented by his or her union representative, can testify, present exhibits, cross-examine other witnesses, and make closing arguments. A General Manager or Terminal Superintendent at BNSF acts on the Conducting Officer's recommendation and makes the ultimate decision to impose discipline on the offending employee. These decisions may be appealed to a labor arbitrator.

Robles committed the first of four Level S violations in September 2008.  At that time, she was part of a crew of BNSF employees that was moving a train in reverse on a track in BNSF's Pearland Yard.  The crew lost control of the train, which then rolled five or ten feet off the end of the track.  A hearing was convened to determine whether Robles or the other crew members had committed a rule violation.  At that hearing, Robles made statements that BNSF later determined were untrue.  Making untrue statements is itself a violation of GCOR and counts as a Level S violation.  After being confronted by BNSF with the evidence of her untrue statements, Robles waived her right to a hearing, accepted the Level S violation for making untrue statements, and was given a 30-day record suspension. *See* Oral Dep. of Janie Robles 79:18–23, Docket Entry No. 17-3; Decl. of Brandon Crossett ¶ 12, Docket Entry No. 17-4.  She continued operating locomotives during the course of her suspension.

The very next month, in October 2008, Robles committed a second Level S violation.  While operating a locomotive in BNSF's Pearland Yard, she failed to see a derail on the track and derailed the front wheel of her locomotive.  This accident caused BNSF to have to pay $2,000 to re-rail the locomotive.  A formal hearing was held to determine her responsibility for the incident.  At that hearing, Robles admitted to having known the location of all the derails in the Pearland Yard.  In part because of that admission, her conduct in the incident was found to

4

constitute another Level S violation. Because it was Robles's second such violation within three years (indeed, within one month), a General Manager at BNSF decided to terminate Robles's employment with BNSF in November 2008.

Robles filed a charge of sex discrimination with the EEOC in August 2009 and, in addition, appealed her termination to a labor arbitrator as allowed under BNSF's union contract. The arbitration panel determined that Robles had indeed committed a Level S violation by running over the derail, but that the punishment of termination had been too severe. *See* Decl. of Brandon Crossett ¶ 15. In early 2010, it reduced her penalty to a 60-day suspension and reinstated her to employment at BNSF with back pay. *Id.* Robles then completed the training required to recertify as an engineer, and, by July 2010, began operating locomotives again. *See id.* ¶ 17; Dep. of Janie Robles 142:16–18.

However, after only a couple months back on the job, Robles committed a third Level S violation. In late August 2010, Robles began working on the "208 job" in BNSF's Houston Yard with two male conductors. About a month later, one of the conductors complained to his supervisor that Robles had made repeated unsolicited comments to him that were both graphic and highly sexual in nature. The supervisor reported the conductor's complaint to BNSF's Human Resources Director. In November 2010, the Human Resources Director took statements from Robles and the two conductors and determined that enough evidence existed to

5

charge Robles with violations of BNSF's Workplace Harassment Policy and of GCOR.[2]  After a formal hearing was held in December 2010, the Conducting officer determined that Robles's conduct supported the finding of a Stand Alone Dismissible violation of both GCOR and BNSF's Workplace Harassment Policy. Decl. of Brandon Crossett ¶ 19.  Brandon Crossett, BNSF's Gulf Division Terminal Superintendent, instead decided to impose the lesser sanction of another Level S violation and another 30-day record suspension. *Id.*

One month later, in January 2011, Robles committed a fourth Level S violation by striking an obstruction during a restricted speed test.  Under GCOR, when a train is required to move at "restricted speed," it must move at a speed allowing it to stop within half the range of vision short of an obstacle and in no case may exceed a speed of 20 miles per hour. Dep. of Janie Robles 182:4–183:6. BNSF tests that its engineers are following this rule as part of its federally mandated obligation to conduct operations tests. Decl. of Brandon Crossett ¶ 21. BNSF does so by placing stop banners on the tracks to serve as simulated obstructions and then giving unwary engineers permission via radio dispatch to

---

[2] The conductors' allegations included claims that Robles repeatedly asked them to have drinks with her after work, talked about affairs that she had had with other male BNSF employees, and made repeated unsolicited comments about sex acts that she wished to engage in. *See* Statement of Ricky Morales, Docket Entry No. 17-2 Ex. A; Statement of Ryan Smith, Docket Entry No. 17-2 Ex. A.

The record also reflects that, prior to her first termination in November 2008, Robles admitted to sending a fellow BNSF employee an unsolicited text message containing a photograph of her naked breasts. Decl. of Brandon Crossett ¶ 16.  It is unclear whether this act influenced the discipline that she received for her various transgressions.

6

proceed into the test area at restricted speed.  *Id.* at ¶¶ 21, 25.  BNSF's stop banners are made of a highly reflective orange material, contain the words "Stop Obstruction" in large letters, and sit in a fiberglass frame that can be hit by a train without causing damage.  *Id.* at ¶ 21.

Late in the evening of January 27, 2011, Robles was serving as the engineer on the "Dayton 281" train traveling between Dayton, Texas and Houston.  Robles had been operating on that route for at least two weeks.  Unbeknownst to her, a crew of BNSF trainmasters conducting restricted speed tests had placed a stop obstruction on a curve approximately 1.7 miles ahead of where her train was paused at a stop signal.  Decl. of Brandon Crossett ¶ 25.  After receiving permission to continue, Robles proceeded forward and—apparently inadvertently due to a downgrade—let the speed of the train increase to 22 miles per hour, above the absolute permissible maximum of 20 miles per hour.  *Id.* at ¶ 26.  She began braking the train as she approached the curve where the stop obstruction had been placed, but did not see the obstruction in time to avoid hitting it; ultimately, the train traveled 550 feet past the obstruction before coming to a halt.  *Id.* at ¶ 26–27; Dep. of Janie Robles 200:13–201:4.  Robles admits that she was not going slow enough to comply with the restricted speed rule that she travel at a speed allowing her to stop within half the range of vision and short of the obstacle.  *See* Dep. of Janie Robles 197:7–14.

7

Shortly thereafter, BNSF convened a formal hearing to determine Robles's responsibility. At that hearing, the Conducting Officer determined that Robles had violated GCOR by failing to maintain restricted speed and striking a stop obstruction, a Level S violation. Decl. of Brandon Crossett ¶¶ 28, 30. As the violation was Robles's fourth in three years (and indeed, her second in several months) she was eligible for termination under PEPA. *Id.* at ¶ 30.

Crossett made the determination to terminate Robles's employment on February 18, 2011. *Id.* Robles was informed of her termination by a written letter of dismissal that stated her termination was "for failing to comply with restricted speed by running over a stop banner." Letter from Brandon Crossett to Janie Robles, Feb. 18, 2011, Docket Entry No. 22-3. The letter also stated that "[i]n assessing discipline, consideration was given to your personnel record and the discipline assessed is in accordance with the BNSF Policy for Employee Performance and Accountability (PEPA)." *Id.* In addition to terminating Robles, BNSF also revoked her engineer's certification. Decl. of Brandon Crossett ¶ 29.

Robles has contested BNSF's disciplinary actions on several fronts. First, she appealed her termination to a labor arbitrator as was her right under the union contract, an appeal that, to this Court's knowledge, has not been resolved. Second, she appealed her decertification as an engineer to the Locomotive Engineer Review Board, an administrative review board of the Federal Railroad Administration. *See*

8

49 C.F.R. § 240.401.  That appeal has been successful.  In February 2012, the Board determined that Robles's admitted failure to comply with restricted speed was not equivalent to a failure to obey a stop "signal" under 49 C.F.R. § 240.117(e)(1), and as such her engineer's license had been improperly revoked.  *See* Decision Concerning Burlington N. Sante Fe Ry.'s Revocation of Ms. J. Roble's [sic] Locomotive Engineer Certification, FRA Docket No. EQAL-2011-09 (Fed. R.R. Admin. Feb. 3, 2012), Docket Entry No. 22-2.  The Review Board's decision did not, however, overturn the finding that she violated the restricted speed rules.  Third and finally, Robles filed a charge of sex discrimination and a separate charge of retaliation with the EEOC, and now brings suit in this Court.

## II.  STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

**III.   DISCUSSION**

   *A.   Sex Discrimination*

   **1.   The Modified *McDonnell Douglas* Framework**

Under Title VII, Robles can prevail on her sex discrimination claim if she can show that her sex was a "motivating factor" behind BNSF's decision to terminate her employment, even if "other factors also motivated" the decision. 42 U.S.C. § 2000e-2(m). Robles has no direct evidence of discrimination. In the Fifth Circuit, the determination of whether circumstantial evidence creates a fact issue concerning discrimination in a Title VII case is made using a modified form of the well-known *McDonnell Douglas* framework.[3] Robles must first establish a prima facie case of sex discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citations omitted). If she can do so, a presumption of discrimination is created, and the burden of production shifts to BNSF. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). BNSF may then fulfill its burden of production by producing evidence that, "if believed by the trier of fact," would show "that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citation and emphasis omitted). Finally, with the presumption of

---

[3] It is unclear from Robles's complaint whether she additionally brings a state law sex discrimination claim under the Texas Commission on Human Rights Act (TCHRA). To the extent that she meant to bring a state law sex discrimination claim, that claim is analyzed under the same standard as her Title VII claim and is resolved similarly. *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 475 & n.2 (Tex. 2001).

discrimination rebutted, Robles may defeat summary judgment by producing evidence "to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination . . . or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (quoting *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

### 2. Analysis

Robles must first establish a prima facie case of sex discrimination. She attempts to do this by pointing to evidence that a number of male BNSF employees committed more serious violations than she did but were not terminated. *See* Pl.'s Resp. to Mot. for Summ. J. 2–3, Docket Entry No. 22. Robles can show a prima facie case of sex discrimination through such disparate treatment by presenting evidence raising a fact issue concerning whether she "(1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) . . . that others similarly situated were treated more favorably." *Okoye v. Univ. of Tex. Hou. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (internal quotation marks and citation omitted). BNSF only disputes the final element of the analysis: whether Robles was treated less favorably than similarly situated male employees. Def. BNSF Ry. Co.'s Mot. for

11

Complete Summ. J. 14, Docket Entry No. 17.

The crucial question is whether Robles can point to evidence raising a fact question regarding whether her proposed comparators—the male employees who were not terminated—were similarly situated to her. "[A]n employee who proffers a fellow employee as a comparator [must] demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'" *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). A number of factors are examined when determining whether a proposed comparator's actions occurred under nearly identical circumstances:

> The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions.

*Lee*, 574 F.3d at 260 (internal quotation marks and citations omitted).

Thus, Robles must point to evidence that would allow the finder of fact to conclude that at least one of her proposed comparators was similar to her in (i) his job or responsibilities; (ii) his supervisor or superior who made decisions regarding his employment status; (iii) his violation history; and (iv) his conduct. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 659 (5th Cir. 2012) (citing *Lee*,

12

574 F.3d at 260). Of these factors, the most important is the similarity of the comparator's conduct to that which led to the plaintiff's termination. "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated." *Lee*, 574 F.3d at 260 (emphasis in original) (quoting *Wallace v. Methodist Hosp. Sys., Inc.*, 271 F.3d 212, 221–22 (5th Cir. 2001)). The conduct must be comparable not only in terms how serious the offenses were; the wrongful acts themselves must be "nearly identical" to each other. *See Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004) (vacating a verdict finding discrimination where the jury was instructed that "comparably serious misconduct was by itself enough to make employees similarly situated"); *Lee*, 574 F.3d at 260 n.23 (citing unpublished cases showing that even minor differences in conduct are enough to make employees dissimilarly situated).

The evidence Robles has produced, which in relevant part consists solely of Robles's deposition testimony and the affidavit of Kevin Shelton,[4] one of her

---

[4] In its reply, BNSF objected to this Court's consideration of Shelton's affidavit on a number of grounds. BNSF claims that the affidavit is defective under Texas law because it lacks a notary's seal and does not meet the requirements to be admissible as a sworn declaration under 28 U.S.C. § 1746. *See* Def. BNSF Ry. Co.'s Reply in Supp. of its Mot. for Complete Summ. J. 2–3 & n.2, Docket Entry No. 25. This Court will nonetheless consider Shelton's affidavit in ruling on BNSF's motion for summary judgment. It is possible that Shelton's affidavit is admissible as a sworn affidavit because, even though it lacks a notary's seal, it does state that Shelton made the affidavit "after being duly sworn," that he stated it "on her [sic] oath," and that the affidavit was "SIGNED AND SWORN Before" the notary. Aff. of Kevin Shelton 1–2, Docket Entry No. 22-1. Although "[i]t is a settled rule in this circuit that an unsworn affidavit is incompetent to raise a

13

union representatives, identifies six named and one unnamed male BNSF employees as potential comparators.[5] However, for a number of reasons, this evidence is not sufficient for Robles to meet her burden of proving that any of them were similarly situated to her. First and foremost, Robles produces no evidence that any of them ever made untrue statements or committed sexual harassment. As Robles's termination letter stated, her disciplinary history, which included such offenses, was considered in the decision to terminate her employment. This difference alone would be enough to make each potential comparator dissimilar to Robles. However, there are a number of additional reasons that the evidence is insufficient to show that the situations of any of the proposed comparators had the level of similarity with Robles's that the Fifth Circuit requires.

The first proposed comparator is Michael Nation. Robles produces no

---

fact issue precluding summary judgment," *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988), "[t]he question whether an affidavit is competent summary judgment evidence begins and ends with the requirements of" Federal Rule of Civil Procedure 56(c)(4). *Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir. 1994). That rule requires only that an affidavit "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4); *see DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529 (5th Cir. 2005) (citing the equivalent language of old Rule 56(e)). Because it is not clear that Shelton's affidavit is inadmissible, this Court will consider it without deciding the issue of admissibility given that summary judgment is warranted even when the affidavit is considered as part of the record.

[5] Robles does not identify any potential comparators by name. Instead, she cites generally to the record and states generically that "several white men were not terminated when violates [sic] of equal or greater severity were alleged." Pl.'s Resp. to Mot. for Summ. J. 4. The record contains references to seven potential comparators, though this Court notes that BNSF has stated in its motion that Robles has pointed to nine potential comparators. *See* Def. BNSF Ry. Co.'s Mot. for Complete Summ. J. 15.

14

evidence that Nation committed his allegedly large number of Level S violations within three years of each other, something that would be necessary for Nation to be terminated under PEPA, and no evidence that she and Nation had the same supervisor or had their discipline determined by the same individual. *See* Aff. of Kevin Shelton 1–2. Moreover, Robles's deposition testimony reflects that Nation's last known violation occurred in 2008, three years prior to Robles's second termination, a fact that falls afoul of the *Lee* court's warning that "[e]mployees . . . who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated." *Lee*, 574 F.3d at 259; Dep. of Janie Robles 120:19–20. Most importantly, Nation fails the fourth comparator factor, that concerning conduct. The relevant evidence shows only that Nation ran stop signals, a type of wrongful conduct different than that committed by Robles. Dep. of Janie Robles 120:8–9. Because there is no indication that his wrongful conduct was "nearly identical" to that of Robles, Nation cannot serve as a comparator. *See Lee*, 574 F.3d at 260 (quoting *Perez*, 395 F.3d at 212).

    The second proposed comparator is Scott Summers. As with Nation, Robles produces no evidence that Summers's alleged Level S violations were committed within three years of each other, or that she and Summers shared supervisors or had their respective discipline determined by the same individual. *See* Aff. of

15

Kevin Shelton 1–2.  And, as with Nation, to the extent that the record identifies the wrongful conduct committed by Summers, that conduct was of a different nature than the wrongful conduct committed by Robles.  Summers improperly caused his train to enter a certain, apparently restricted area without radio authorization and, in a second case, hit a berm with his train while in BNSF's Dayton Yard.  Dep. of Janie Robles 123: 14–25.  While these violations may have been comparable in seriousness to certain of Robles's improper acts, the conduct underlying them was not "nearly identical" to the violations committed by Robles.  *Lee*, 574 F.3d at 260 (quoting *Perez*, 395 F.3d at 212).  Summers cannot serve as a comparator.

The third proposed comparator is Travis Williams, the conductor on Robles's train on the night that she failed the restricted speed test.  Robles has failed to present any evidence whatsoever regarding Williams's violation history.  The Shelton affidavit, Robles's main source for such information, does not mention Williams at all, and Robles admitted in her deposition that she did not know whether Williams had any previous Level S violations or even that she knew anything at all about his disciplinary record.  Dep. of Janie Robles 125:16–126:10.  This lack of evidence is fatal, particularly since BNSF's policies would not even allow it to terminate Williams if he had no other Level S violations within three years of the failed restricted speed test.  Williams may not be used as a comparator.

None of the remaining four individuals come close to serving as appropriate

16

comparators. The evidence regarding the fourth proposed comparator, Travis Searcy, is insufficient with regard to his supervisor, his violation history, and the conduct underlying his violations. *See* Dep. of Janie Robles 127:18–19; Aff. of Kevin Shelton 1–2. In fact, as with Nation, the only evidence is that Searcy ran a stop signal, something Robles did not do. Likewise, the only evidence concerning the fifth proposed comparator, Bill Duggar, is Robles's testimony that Duggar told her he had a derail in the Pearland Yard. *See* Dep. of Janie Robles 126:14–127:7. There is no evidence concerning the identity of Duggar's supervisor or of the individual who determined Duggar's discipline, no evidence regarding Duggar's violation history, and no evidence concerning Duggar's conduct leading to the derail or to any other violations that Duggar may have committed. Similarly, the only evidence mentioning the sixth proposed comparator, Keith Cross, is the conclusory statement in Shelton's affidavit that Cross "had numerous disciplinary records and more serious violations." Aff. of Kevin Shelton 1. Finally, the only evidence regarding the seventh, unnamed proposed comparator is Robles's statement that another employee involved in her second Level S violation, the 2008 derailing, was not terminated while she was. Dep. of Janie Robles 118:6–20. Among other things, there is no evidence of that unnamed employee's violation history, which would determine whether he was eligible for termination under BNSF policy. None of these individuals can be used as comparators.

17

Robles has failed to put forward evidence showing that any of her proposed comparators were similarly situated to her. For that reason, she cannot show disparate treatment and thus cannot make a prima facie case of sex discrimination. Moreover, the Court notes that even if Robles had presented a prima facie case, BNSF has put forward a legitimate nondiscriminatory reason for her termination: the four Level S violations she committed within three years. Summary judgment would be appropriate even if Robles presented a prima facie case because she has not produced evidence that could show that BNSF's reason was a pretext for discrimination or that discrimination was a motivating factor in her termination.

### *B.   Retaliation*

Robles did not defend her retaliation claim in her response to BNSF's motion for summary judgment, and, moreover, she appeared to waive that claim in response to this Court's question at docket call. *See* Pl.'s Resp. to Mot. for Summ. J. 1–7; Minute Entry for Docket Call, July 10, 2012. Out of an abundance of caution, this Court will briefly discuss her claim and will rule that Robles has not established a prima facie case of retaliation.

Robles has alleged that her February 2011 termination was made in retaliation for her filing two charges of sex discrimination against BNSF with the

EEOC.[6]  *See* Pl.'s Original Compl. 4, Docket Entry No. 1-4; EEOC Charge of Discrimination (May 13, 2011), Docket Entry No. 17-3.  To prove a prima facie case of retaliation under Title VII, Robles must show that "(1) [s]he participated in an activity protected by Title VII; (2) [her] employer took an adverse employment action against [her]; and (3) a causal connection exists between the protected activity and the adverse employment action."  *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  She cannot establish the third element, a causal connection between her filing of the EEOC charges and her termination.  The only evidence of a causal connection that Robles produces is timing.  Although "[c]lose timing between an employee's protected activity and an adverse action against [her] may provide the causal connection required to make out a *prima facie* case of retaliation," the timing must in fact be close, because "the mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a *prima facie* case."  *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 & n.3 (5th Cir. 1997) (emphasis in original) (quotation omitted).

---

[6] In addition, Robles's deposition testimony indicates her belief that she was terminated in retaliation for reporting at least one on-the-job injury to BNSF.  *See* Dep. of Janie Robles 33:2–17, 256:6–9.  To the extent that Robles contends that she was terminated in retaliation for requesting a reasonable accommodation under either the ADA or the TCHRA, she has failed to exhaust her administrative remedies because she did not include any mention of an injury, disability, or request for reasonable accommodation in either of the two EEOC charges she filed following her February 2011 termination.  *See* EEOC Charge of Discrimination (May 13, 2011), Docket Entry No. 17-3; EEOC Charge of Discrimination (Mar. 15, 2011), Docket Entry No. 25-1.  Because neither of Robles's EEOC charges stated any facts that could have put BNSF on notice that it might face a charge of retaliation for failure to provide reasonable accommodations, she may not raise such a claim in this suit.  *See Manning v. Chevron Chem. Co.*, 332 F.3d 874, 878–79 (5th Cir. 2003) (citing *EEOC v. Shell Oil Co.*, 466 U.S. 54, 77 (1984)).

When an employee provides no evidence of retaliation other than timing, and a significant period of time has elapsed between the protected activity and the adverse employment action, a plaintiff typically cannot establish a prima facie case. In this case, Robles was terminated in February 2011, twenty months after she filed her first EEOC charge in August 2009. As the Supreme Court has stated, "Action taken . . . 20 months later suggests, by itself, no causality at all." *Clark Cnty. Sch. Dist. v. Breedan*, 532 U.S. 268, 274 (2001) (per curiam); *see also Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002) (stating that a five-month gap, without other evidence, is insufficient to show causation). With no other evidence of retaliation, the timing is insufficient to create a genuine issue of material fact regarding a causal connection. And, of course, Robles's second EEOC charge of discrimination, which was filed on March 15, 2011, cannot be linked to a termination that occurred nearly one month prior and was the reason the charge was filed in the first place. Robles cannot show a prima facie case of retaliation. Accordingly, Defendant BNSF Railway Company's Motion for Complete Summary Judgment (Docket Entry No. 17) is **GRANTED**.

**IT IS SO ORDERED**.

**SIGNED** this 4th day of September, 2012.

_____
Gregg Costa
United States District Judge

20